**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **SHAYLYNN DOXIE, BRITTNEY GRAY, KATALEENA HELMICK, LANI HOLLOWAY, ASHLEY POPA** and, **DENIEGE REVORD**, individually and on behalf of a class of similarly situated individuals,<br><br>**PLAINTIFFS,**<br><br>V.<br><br>**ABBOTT LABORATORIES**, (a Delaware corporation),<br><br>**DEFENDANT**. | ) Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **DEMAND FOR JURY TRIAL**<br>)<br>)<br>)<br>)<br>)<br>) |

**CLASS ACTION COMPLAINT**

1.      Plaintiffs Shaylynn Doxie, ("Doxie"), Brittany Gray ("Gray"), Kataleena Helmick, ("Helmick"), Lani Holloway ("Holloway"), Ashley Popa ("Popa"), and Deniege Revord ("Revord") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint against Defendant Abbott Laboratories ("Defendant") for its knowing, reckless, and/or intentional practice of failing to fully disclose the presence of arsenic, cadmium, lead, or mercury (collectively, "Heavy Metals") in its Similac® powdered infant Formula ("Products" or "Infant Formula").[1] The Products are sold

---

[1] "Products" or "Infant Formula" refers to the following Abbott Laboratories products: Similac® Pro Advance, Similac® 360 Total Care, Similac® Soy Isomil Similac® Advance OptiGRO Powder – Milk-Based, and Similac® Neosure powdered infant Formula. Discovery may reveal additional products that contain levels of Heavy Metals. Plaintiffs reserve their right to include any such products in this action.

throughout the United States and do not conform to their packaging. Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Class (as defined herein), including requiring full disclosure of all such Heavy Metals in the Products packaging, and restoring monies to the members of the proposed Class. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel as to themselves, and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

2.      Babies rely on breastmilk and/or infant formula for their nutrition and growth. The U.S. Dietary Guidelines for Americans and the American Academy of Pediatrics recommends breastfeeding babies exclusively for about six months from birth and continuing afterwards along with introduction of solid foods until they are 12 months old and beyond.[2] However, according to the CDC, only 46.3% of babies under three months old are exclusively breastfed and the percentage of babies exclusively breastfed through six months drops to 25.8%.[3] For babies younger than six months, the CDC recommends that breast milk or infant formula are the only things they eat for their nutrition, and while supplementing with some solid food, breastmilk or infant formula is recommended up to when they are 24 months old.[4] Therefore, significant numbers of babies rely on infant formula for their growth and nutrition in the first year of their lives and beyond.

---

[2]      Infant and Toddler Nutrition: Recommendation and Benefits cdc.gov/nutrition/infantandtoddlernutrition/breastfeeding/recommendations-benefits.html (last accessed on March 3, 2022).

[3] Key Breastfeeding Indicators, available at https://www.cdc.gov/breastfeeding/data/facts.html (last accessed on March 3, 2022).

[4] https://www.cdc.gov/nutrition/InfantandToddlerNutrition/foods-and-drinks/when-to-introduce-solid-foods.html.

3.      Reasonable parents, like Plaintiffs, trust manufacturers, like Defendant, to sell Infant Formula that is healthy, nutritious, and free from harmful toxins, contaminants, and chemicals. They certainly expect the formula they feed their infants to be free from Heavy Metals, substances known to have significant and unsafe developmental and health consequences.

4.      Consumers lack the scientific knowledge necessary to determine whether the Defendant's Products do in fact contain Heavy Metals and/or other undesirable toxins or contaminants, or to ascertain the true nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do rely on Defendant to properly and fully disclose what its Products contain. This is especially true for a product's contents like arsenic, lead, cadmium, and mercury that are being fed to hours-, days- or months-old babies. Such information would be material to any reasonable parent's purchasing decisions.

5.      Defendant manufactures, formulates, markets, advertises, packages, distributes, and sells infant formula products under the brand name Similac® throughout the United States, including in this District.

6.      To justify a premium price and induce reasonable consumers to believe in the quality and safety of its Products, Defendant's packaging emphasizes that the Infant Formula is healthy, nutritious, and made with superior ingredients and not made with detrimental and genetically engineered ingredients.

 

## NO ARTIFICIAL GROWTH HORMONES*
## NON GMO† • NO PALM OLEIN OIL

**NOT FOR INFANTS OR CHILDREN WITH GALACTOSEMIA**

NUTRIENTS per 100 Calories (5 fl oz, prepared as directed)

| | | | | | | |
|---|---|---|---|---|---|---|
| PROTEIN | 2.17 g | CARBOHYDRATE | 10.5 g | LINOLEIC ACID | 1000 | mg |
| FAT | 5.30 g | WATER | 134 g | | | |

**VITAMINS**

| | | | | | | |
|---|---|---|---|---|---|---|
| VITAMIN A | 300 IU | RIBOFLAVIN (VIT. B₂) | 150 mcg | PANTOTHENIC ACID | 450 | mcg |
| VITAMIN D | 60 IU | VITAMIN B₆ | 60 mcg | BIOTIN | 4.4 | mcg |
| VITAMIN E | 1.5 IU | VITAMIN B₁₂ | 0.25 mcg | VIT. C (ASCORBIC ACID) | 9 | mg |
| VITAMIN K | 8 mcg | NIACIN | 1050 mcg | CHOLINE | 24 | mg |
| THIAMIN (VIT. B₁) | 100 mcg | FOLIC ACID (FOLACIN) | 15 mcg | INOSITOL | 24 | mg |

**MINERALS**

| | | | | | | |
|---|---|---|---|---|---|---|
| CALCIUM | 78 mg | ZINC | 0.75 mg | SELENIUM | 2 | mcg |
| PHOSPHORUS | 42 mg | MANGANESE | 5 mcg | SODIUM | 24 | mg |
| MAGNESIUM | 6 mg | COPPER | 90 mcg | POTASSIUM | 105 | mg |
| IRON | 1.8 mg | IODINE | 15 mcg | CHLORIDE | 65 | mg |

**INGREDIENTS:** NONFAT MILK, LACTOSE, HIGH OLEIC SAFFLOWER OIL, WHEY PROTEIN CONCENTRATE, SOY OIL, COCONUT OIL, HUMAN MILK OLIGOSACCHARIDES* (2'-FUCOSYLLACTOSE, LACTO-N-TETRAOSE, 3-FUCOSYLLACTOSE, 6'-SIALYLLACTOSE, 3'-SIALYLLACTOSE). **LESS THAN 2% OF:** C. COHNII OIL, M. ALPINA OIL, BETA-CAROTENE, LUTEIN, POTASSIUM CITRATE, CALCIUM CARBONATE, ASCORBIC ACID, SOY LECITHIN, POTASSIUM CHLORIDE, MAGNESIUM CHLORIDE, FERROUS SULFATE, CHOLINE BITARTRATE, CHOLINE CHLORIDE, ASCORBYL PALMITATE, SALT, TAURINE, INOSITOL, ZINC SULFATE, MIXED TOCOPHEROLS, d-ALPHA-TOCOPHERYL ACETATE, NIACINAMIDE, CALCIUM PANTOTHENATE, L-CARNITINE, VITAMIN A PALMITATE, COPPER SULFATE, THIAMINE HYDROCHLORIDE, RIBOFLAVIN, PYRIDOXINE HYDROCHLORIDE, FOLIC ACID, MANGANESE SULFATE, PHYLLOQUINONE, BIOTIN, SODIUM SELENATE, VITAMIN D₃, VITAMIN B₁₂, CALCIUM PHOSPHATE, POTASSIUM PHOSPHATE, POTASSIUM IODIDE, POTASSIUM HYDROXIDE, AND NUCLEOTIDES (ADENOSINE 5'-MONOPHOSPHATE, CYTIDINE 5'-MONOPHOSPHATE, DISODIUM GUANOSINE 5'-MONOPHOSPHATE, DISODIUM URIDINE 5'-MONOPHOSPHATE). **CONTAINS MILK AND SOY INGREDIENTS.**

**ABBOTT NUTRITION**, ABBOTT LABORATORIES, COLUMBUS, OHIO 43219-3034 USA
*HMO, NOT FROM HUMAN MILK, SOURCE OF DNA, SOURCE OF RNA.

* No significant difference has been shown between milk derived from rbST-treated and non-rbST-treated cows.
† Ingredients not genetically engineered.



7.   Defendant states the Infant Formula contains superior ingredients such as Docosahexaenoic Acid ("DHA"), prebiotics such as human milk oligosaccharides ("HMO"), and lutein and beta-carotene.[5]



---

[5] https://www.similac.com/baby-formula-ingredients.html (last accessed Feb. 26, 2022).

8.      Based on the impression given by the packaging and lack of any disclosures, no reasonable consumer could expect or understand that the Infant Formula contained Heavy Metals. This is especially true as the development and physical risks created by ingestion of Heavy Metals by infants is well-recognized.

9.      Defendant uses its other marketing to further promise a healthy product that poses no risks to any infants. Specifically, Defendant promises on its website: (1) to give babies "the very best, with nutrition [parents] can trust to keep [babies] fed, happy, and healthy;"[6] (2) that parents "can be confident in the nourishment of Similac;"[7] and that (3) that its Products are "enriched with key vitamins, minerals, and nutrients to help give your little one a strong start[,]"[8] This is all in direct contradiction to the true nature of the Infant Formula's contents, which include Heavy Metals.

10.     The Infant Formula has been shown to contain detectable levels of arsenic, cadmium, lead, mercury, and/or perchlorate, all known to pose health risks to humans, and particularly to infants.[9]

11.     Despite this, Defendant knowingly chose to not disclose to consumers that the Infant Formula contains, or has a material risk of containing), Heavy Metals. Nowhere on the Infant Formula's packaging is it disclosed that it contains, or has a material risk of containing, Heavy Metals (hereinafter collectively referred to as "Omissions").

---

[6] https://www.similac.com/the-similac-difference.html (last accessed Feb. 26, 2022).

[7] https://www.similac.com/why-similac.html (last accessed Feb. 26, 2022).

[8] https://www.similac.com/the-similac-difference.html (last accessed Feb. 26, 2022).

[9] Healthy Babies Bright Futures' Report: *What's in My Baby's Food?* ("HBBF Report"), available at  https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 26, 2022).

12.     The Infant Formula's packaging does not include any type of disclaimer or disclosure regarding the presence of Heavy Metals that would inform consumers of their presence. Likewise, nothing on the packaging states that Heavy Metals can be unsafe or accumulate over time resulting in developmental issues, poisoning, injury, and/or disease.

13.     Instead, to justify a premium price, Defendant chose to focus on promoting its Infant Formula as high quality, made with superior ingredients and not made with detrimental and genetically engineered ingredients.

14.     On information and belief, it was recently revealed that Defendant was knowingly, recklessly, and/or intentionally selling infant formula that contained arsenic, cadmium, lead, and mercury.

15.     Indeed, the World Health Organization ("WHO") and UNICEF acknowledged the troubling marketing efforts by Infant Formula manufacturers, and recently released a new report titled "How Marketing of Formula Milk Influences Our Decisions on Infant Feeding."[10] This report raises deep concerns over the lasting and pervasive negative effects from the false and misleading information received by parents such as Plaintiffs through such aggressive marketing efforts by Infant Formula manufacturers like Defendant.[11]

16.     Exposure to Heavy Metals has significant and dangerous health consequences. A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("Congressional Committee Report") highlighted the

---

[10]     https://www.who.int/teams/maternal-newborn-child-adolescent-health-and-ageing/formula-milk-industry (last accessed March 2, 2022).

[11] Infant formula promoted in "aggressive" and "misleading" ways, says new global report, available at https://www.npr.org/sections/goatsandsoda/2022/03/01/1082775961/infant-formula-promoted-in-aggressive-and-misleading-ways-says-new-global-report (last accessed March 2, 2022).

risk of including Heavy Metals in baby food, spurred by the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development."[12]

17.     Recent testing conducted on three of the Similac® Infant Formulas confirmed the presence of Heavy Metals, to include:

| Infant Formula | Level of Heavy Metal |
|---|---|
| Similac® Soy Isomil | 11.4 ppb Cadmium |
| Similac® 360 Total Care | 6.7 ppb Arsenic |
| Similac® Pro Advance | 10.1 ppb Mercury |

18.     Independent testing also confirmed the presence of two Heavy Metals in another of Defendant's products:[13]

| Infant Formula | Level of Arsenic | Level of Lead |
|---|---|---|
| Similac® Advance OptiGRO Powder – Milk-Based | 4.6 ppb | 2 ppb |

19.     Based on the Omissions, no reasonable consumer had any reason to know or expect that the Infant Formula contained Heavy Metals. Furthermore, reasonable parents, like Plaintiffs,

---

[12]U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," February 4, 2021, available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed Feb. 26, 2022) ("Congressional Committee Report"). *See also* U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods," September 29, 2021, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf (last accessed Feb. 26, 2022) ("Second Congressional Committee Report").

[13] HBBF Report, *supra*, at 20, 34.

who were feeding the Infant Formula to their babies (multiple times a day) would consider the mere presence (or risk) of Heavy Metals a material fact when considering whether to purchase the Infant Formula.

20.     Defendant knows its customers trust the quality of its products and expect the Infant Formula to be free of Heavy Metals. Defendant also knows consumers seek out and wish to purchase premium Infant Formula that possesses superior ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay more for Infant Formula they believe possesses these qualities. Defendant also knows no reasonable consumer would knowingly provide his or her children with Infant Formula that contained Heavy Metals.

21.     Defendant knew the parents to whom it marketed the Infant Formula would find the Omissions material and that it was in a special position of public trust to those consumers.

22.     The Omissions are deceptive, misleading, unfair, and/or false because the Infant Formula contains or risks containing undisclosed levels of Heavy Metals.

23.     The Omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Infant Formula that did not disclose material information as to the Products' true quality and value. Defendant continues to wrongfully induce consumers to purchase its Infant Formula.

24.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for use and not resale any of Defendant's Infant Formula.

## JURISDICTION AND VENUE

25.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds

the sum or value or $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d)(2) do not apply.

26.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiffs suffered injury as a result of Defendant's acts in this District, many of the acts and transactions giving rise to this action occurred in this District, and Defendant conducts substantial business in this District.

## **THE PARTIES**

27.     Plaintiff Shaylynn Doxie ("Plaintiff Doxie") is, and at all times relevant hereto has been, a citizen of the State of California and a resident of Sacramento, California. She purchased the Infant Formula, including Similac Pro-Advance and Similac 360 Total Care.

28.     Plaintiff Doxie purchased the Infant Formula for her child from retail outlets such as Target, CVS, Rite Aid, Walmart, and Amazon during and within the statutory limitations period.

29.     Plaintiff Doxie believed she was feeding her children healthy and nutritious Infant Formula. Prior to purchasing the Infant Formula, Plaintiff Doxie saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her children the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals and would not have purchased the Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products, including the Products, in the future if she could be certain that they do not contain (or have a material risk of containing) Heavy Metals.

30.     Plaintiff Brittney Gray ("Plaintiff Gray") at all times relevant hereto was a citizen of the State of Hawaii and a resident of Honolulu, Hawaii. She purchased the Infant Formula, including Similac Pro-Advance.

31.     Plaintiff Gray purchased the Infant Formula for her child from Fry's Food and Drug Store, Walmart and Safeway, in Hawaii, during and within the statutory period of limitations.

32.     Plaintiff Gray believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Gray saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals and would not have purchased the Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products in the future if she could be certain that they do not contain (of have a material risk of containing) Heavy Metals.

33.     Plaintiff Kataleena Helmick ("Plaintiff Helmick") at all times relevant hereto was a citizen of the State of Nebraska and a resident of Auburn, Nebraska.  She purchased the Infant Formula, including Similac Pro-Advance.

34.     Plaintiff Helmick purchased the Infant Formula for her child from Walmart in Nebraska, during and within the statutory period of limitations.

35.     Plaintiff Helmick believed she was feeding her child healthy and nutritious Infant Formula.   Prior to purchasing the Infant Formula, Plaintiff Helmick saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals and would not have purchased the

Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products in the future if she could be certain that they do not contain (of have a material risk of containing) Heavy Metals.

36.     Plaintiff Lani Holloway ("Plaintiff Holloway") at all times relevant hereto was a citizen of the State of Texas and a resident of Trenton, Texas.  She purchased the Infant Formula, including Similac Pro-Advance.

37.     Plaintiff Holloway purchased the Infant Formula for her child from Walmart in Sherman, Texas, during and within the statutory period of limitations.

38.     Plaintiff Holloway believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Holloway saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals and would not have purchased the Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products in the future if she could be certain that they do not contain (of have a material risk of containing) Heavy Metals.

39.     Plaintiff Ashley Popa ("Plaintiff Popa") at all times relevant hereto was a citizen of the Commonwealth of Pennsylvania and a resident of New Castle, Pennsylvania.  She purchased the Infant Formula, including Similac Pro-Advance.

40.     Plaintiff Popa purchased the infant formula for two separate babies from Walmart and Giant Eagle in New Castle, Pennsylvania and from Target in Boardman, Ohio during and within the statutory period of limitations.

41.     Plaintiff Popa believed she was feeding her children healthy and nutritious infant formula.  Prior to purchasing the Infant Formula, Plaintiff Popa saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her children the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals and would not have purchased the Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products in the future if she could be certain that they do not contain (of have a material risk of containing) Heavy Metals.

42.     Plaintiff Deniege Revord ("Plaintiff Revord") at all times relevant hereto was a citizen of the State of Michigan and a resident of Pinconning, Michigan.  She purchased the Infant Formula, including Similac Pro-Advance and Similac Total Comfort.

43.     Plaintiff Revord purchased the Infant Formula for her child on Amazon, and from Walmart and Meijer in Michigan, during and within the statutory period of limitations.

44.     Plaintiff Revord believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Revord saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formula contained (or had a material risk of containing) any level of Heavy Metals and would not have purchased the Infant Formula if that information had been fully disclosed. Plaintiff would be willing to purchase Similac® products in the future if she could be certain that they do not contain (of have a material risk of containing) Heavy Metals.

45.     As the result of Defendant's intentionally, recklessly, and/or knowingly deceptive conduct as alleged herein, Plaintiffs were injured when they paid the purchase price or a price

premium for the Infant Formula that did not deliver what was promised by Defendant. Plaintiffs paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formula was free of Heavy Metals, and the Infant Formula was safe for consumption. Plaintiffs would not have paid this money had they known that the Infant Formula included levels of Heavy Metals. Further, should Plaintiffs encounter the Infant Formula in the future, they could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Infant Formula. Damages can be calculated through expert testimony at trial.

46. Defendant Abbott Laboratories is a Delaware corporation with a principal place of business in Abbott Park, Illinois, in Lake County. Defendant has intentionally availed itself of the laws and markets of this District, and Defendant is subject to personal jurisdiction in this District.

47. Defendant, one of the largest producers of infant formula products in the world, has formulated, developed, manufactured, labelled, distributed, marketed, advertised, and sold the Infant Formula under the Similac® name throughout the United States, including in this District. It has done so continuously throughout the Class Period from March 1, 2016 to present. Defendant knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and related marketing for the Infant Formula that did not disclose the presence of Heavy Metals. Defendant is also responsible for sourcing ingredients, manufacturing the Products, and conducting all relevant quality assurance protocols, including testing of both the ingredients and finished Infant Formula.

48. Plaintiffs relied upon the material Omissions from the Infant Formula packaging, which was prepared, reviewed, and/or approved by Defendant and its agents at its headquarters in Illinois and disseminated by Defendant and its agents through the Omissions from the packaging.

The Omissions were nondisclosed material content that a reasonable consumer would consider important in purchasing the Infant Formula.

49.     The Infant Formula, at a minimum, includes:

(a)     Similac® Soy Isomil:



(b)     Similac® 360 Total Care:



(c)    Similac® Pro Advance Label:



(d)     Similac® Advance OptiGRO Powder – Milk-Based:



(e)     Similac® Neosure:



**FACTUAL ALLEGATIONS**

**I.      Heavy Metals are Present in Infant Formula**

50.     The presence of Heavy Metals in baby foods, including Infant Formula, has been investigated and acknowledged by independent third parties.

51.     Investigations by Healthy Babies Bright Futures,[14] Consumer Reports,[15] and studies by the FDA,[16] University of Miami, the Clean Label Project, and Ellipse Analytics[17] show the presence of Heavy Metals and/or other undesirable toxins or contaminants in baby foods.

52.     The Congressional Committee Report, published on February 4, 2021, followed by a subsequent report published on September 29, 2021, revealed alarming levels of Heavy Metals in baby foods, stating that Heavy Metals—including arsenic, cadmium, lead, and mercury—were present in "significant levels" in numerous commercial baby food products.[18]

53.     Given the concern about Heavy Metals in baby foods, the federal and state governments are contemplating acceptable levels of Heavy Metals in foods for infants and toddlers.

54.     The Baby Food Safety Act of 2021 (the "Act") is pending in the U.S. Senate and U.S. House.[19] The Act would amend the Federal Food, Drug, and Cosmetic Act ("FDCA") to limit the presence of toxic elements in, and otherwise regulate, infant and toddler food.

---

[14] Healthy Babies Bright Futures' Report: *What's in My Baby's Food?*, at 12, 20, available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 26, 2022) ("HBBF Report").

[15] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know*, available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed Feb. 27, 2022) ("Consumer Reports: Heavy Metals in Baby Food").

[16] https://www.fda.gov/media/77948/download (last accessed Feb. 26, 2022) ("FDA Total Diet Study").

[17] Gardener, et al., *Lead and cadmium contamination in a large sample of United States infant Formula and baby foods*, 651 SCI. TOTAL ENVIRON. 1, 822-827 (2019), available at: https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442?via%3Dihub (last accessed Feb. 27, 2022) *("Lead and Cadmium Contamination in Infant Formula and Baby Foods")*.

[18] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[19] The Act, *supra*.

55.     Specifically, the Act would establish the following maximum levels of certain toxic elements allowable in infant and toddler food:

| Toxic Element | Proposed Action Level |
|---|---|
| Inorganic arsenic | 10 ppb for infant and toddler food (except cereal) and 15 ppb for infant and toddler food that is cereal |
| Cadmium | 5 ppb for infant and toddler food (except cereal) and 10 ppb for infant and toddler food that is cereal |
| Lead | 5 ppb for infant and toddler food (except cereal) and 10 ppb for infant and toddler food that is cereal |
| Mercury | 2 ppb |

56.     The Food and Drug Administration ("FDA"), through its Closer to Zero Initiative ("Action Plan"), is reviewing the levels of Heavy Metals in baby foods, including Infant Formula, and considering action levels for certain toxic elements as appropriate.[20]  The FDA states that it has "prioritized babies and young children because their smaller body sizes and metabolism make them more vulnerable to the harmful effects of these contaminants."[21] The Action Plan is an "iterative approach for achieving continual improvements over time."[22]

57.     As a result of a legal settlement, California has established ingredient sourcing and quality control processes to significantly reduce levels of lead in infant and toddler formula products.[23] For most of these products to be sold in the market, the maximum allowable levels of lead is 5 to 7 ppb.[24]

---

[20] "Closer to Zero: Action Plan for Baby Foods," https://www.fda.gov/food/metals-and-your-food/closer-zero-action-plan-baby-foods (last accessed Feb. 27, 2022) ("Action Plan").

[21] *Id.*

[22] *Id.*

[23] https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-settlement-perrigo-improve-safety-infant-and (last accessed Feb. 27, 2022) ("Settlement").

[24] *Id.*

58.     And based upon information and belief, at least one state, Washington, stated it would also consider filing a similar suit if infant formula containing toxic metals such as lead were sold in Washington.

59.     Any proposed Action Levels would only prohibit the Infant Formula from being placed on the market if the product exceeded those levels, it would not require any presence of Heavy Metals under the Action Level be disclosed on the product's packaging.

60.     Thus, despite the consideration of appropriate levels of Heavy Metals in food for children, these proposals, plans, and settlements do not address the basis of this lawsuit: the disclosure of these toxins on the product packaging.[25]

## II.     Defendant Falsely Marketed Its Infant Formula as Healthy, Nutritious, and Made with Superior Ingredients by Omitting Any Mention of Heavy Metals

61.     Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Infant Formula throughout the United States, including Illinois.

62.     Defendant's Infant Formula is available at numerous retail and online outlets. The Infant Formula is widely advertised.

63.     Defendant advertises its Infant Formula as the "#1 Pediatrician Recommended Brand for Immune Support," "#1 Brand Fed in Hospitals," and "#1 Brand Chosen by Parents."

---

[25] *See*, *generally*, Action Plan, *supra*; S.1019, introduced March 25, 2021, available at https://www.congress.gov/117/bills/s1019/BILLS-117s1019is.pdf and H.R. 2229, introduced March 26, 2021, available at https://www.congress.gov/117/bills/hr2229/BILLS-117hr2229ih.pdf (the "Act"); Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*; Settlement, *supra*.



64. On its website, Defendant "promise[s] to nourish the journey of parents and their babies."[26] Defendant informs consumers that its Products have "no artificial growth hormones" and "no palm olein oil[.]"[27] Defendant claims that it "continues to give moms new ways to nourish their babies with options like hypoallergenic, soy, organic, sensitive, and non-GMO Formula."[28]

65. Defendant touts its innovations to its infant formula and provides thorough information about the ingredients in its Formula to consumers on an FAQ section of its website.[29]

66. Defendant promotes its "heritage" as "[a] spirit of innovation that began in 1925 and hasn't stopped since[.]"[30]

67. Based on Defendant's decision to wholly omit mention of the presence of Heavy Metals in the Infant Formula, and to instead package its Infant Formula as healthy, nutritious, and made with superior ingredients, it had a duty to ensure that the Products' packaging was true and not misleading. As such, Defendant knew or should have known the Infant Formula included

---

[26] https://www.similac.com/why-similac.html (last accessed Feb. 26, 2022).

[27] https://www.similac.com/why-similac.html (last accessed Feb. 26, 2022).

[28] https://www.similac.com/why-similac.html (last accessed Feb. 26, 2022).

[29] https://www.similac.com/baby-tools-resources/baby-questions.html (last accessed Feb. 27, 2022).

[30] https://www.similac.com/why-similac.html (last accessed Feb. 27, 2022).

nondisclosed Heavy Metals and that over time, these toxins can accumulate and remain in infants' bodies, to their detriment.

68.     Defendant intentionally omitted the presence or material risk of Heavy Metals in the Infant Formula in order to induce and mislead reasonable consumers to purchase its Infant Formula.

69.     With Defendant marketing its Infant Formula as healthy, nutritious, and made with superior ingredients to nourish babies, Defendant clearly recognizes the importance of its Infant Formula to the development of infants.

70.     As a result of the material Omissions, a reasonable consumer would have no reason to suspect the presence or material risk of Heavy Metals in the Infant Formula without conducting his or her own scientific tests (which are time consuming and expensive) or reviewing third-party scientific testing of these Products.

III.    **Due to the Presence and Material Risk of Heavy Metals in the Infant Formula, the Omissions are Misleading**

71.     At all times during the Class Period, Defendant knew or should have known the Infant Formula included undisclosed Heavy Metals and was not sufficiently tested for the presence and material risk of Heavy Metals.

72.     Defendant's Infant Formula included undisclosed levels of Heavy Metals due to Defendant's failure to monitor for the presence in the ingredients and finished products.  Defendant was aware of this risk and failed to disclose it to Plaintiffs and the Class despite having a duty to disclose.

73.     Defendant knew or should have known that Heavy Metals pose health risks to infants.

74.     Defendant knew or should have known that it owed consumers a duty of care to prevent, or at the very least, minimize the presence of Heavy Metals in the Infant Formula to the extent reasonably possible.

75.     Defendant knew or should have known it owed consumers a duty of care to adequately test for Heavy Metals in the Infant Formula.

76.     Defendant knew consumers purchased the Infant Formula based on the reasonable expectation that Defendant manufactured the Infant Formula to the highest standards. Based on this expectation, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Infant Formula to the highest standards for preventing the inclusion of Heavy Metals in the Infant Formula, which would include testing the Infant Formula's ingredients and finished products for Heavy Metals.

77.     The Congressional Committee Report acknowledged that Heavy Metals "can endanger infant neurological development."[31]

78.     The FDA and the WHO have declared Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[32]

79.     Additionally, while there are no U.S. federal regulations regarding acceptable levels of Heavy Metals in infant Formula, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who

---

[31] Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed Feb. 26, 2022) ("Toxic Heavy Metals in Popular Baby Foods").

[32] Congressional Committee Report, *supra*, at 2.

studies environmental health effects, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[33]

80.    Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[34]

81.    Arsenic, lead, mercury, and cadmium—the Heavy Metals found in the Infant Formula—are neurotoxins, or poisons, which affect the nervous system. Exposure to these Heavy Metals "diminish[es] quality of life, reduce[s] academic achievement, and disturb[s] behavior, with profound consequences for the welfare and productivity of entire societies."[35]

82.    The four Heavy Metals (arsenic, cadmium, lead, and mercury) "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder ("ADHD")."[36] Even when trace amounts are found in food, these Heavy Metals can alter the developing brain and erode a child's intelligence quotient ("IQ").[37]

83.    Because Heavy Metals accumulate in the body, including in the kidneys and other internal organs, the risk they pose grows over time and can remain in one's body for years.[38]

---

[33] *Some Baby Food May Contain Toxic Metals, U.S. Reports*, available at https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed Feb. 26, 2022) ("Some Baby Food May Contain Toxic Metals").

[34] FDA: *Metals and Your Food*; available at https://www.fda.gov/Food/FoodborneIllness Contaminants/Metals/default.htm (last accessed Feb. 26, 2022).

[35] HBBF Report, *supra*, at 13.

[36] *Id.* at 6.

[37] Congressional Committee Report, *supra*, at 1.

[38] Consumer Reports: Heavy Metals in Baby Food, *supra*.

84.     Due to their smaller physical size and still-developing brain and organs, infants and toddlers are particularly susceptible to the toxic effects of Heavy Metals because "[t]hey also absorb more of the heavy metals that get into their bodies than adults do."[39]

85.     Of additional concern to developing infants are the health risks related to simultaneous exposure to multiple Heavy Metals as "co-exposures can have interactive adverse effects."[40] Heavy Metals disturb the body's metabolism and cause "significant changes in various biological processes such as cell adhesion, intra- and inter-cellular signaling, protein folding, maturation, apoptosis, ionic transportation, enzyme regulation, and release of neurotransmitters."[41]

86.     Exposure to Heavy Metals, even in small amounts, can lead to life-long effects. According to Victor Villarreal, Ph.D., Assistant Professor in the Department of Educational Psychology at the University of Texas at San Antonio who has studied the effects of heavy metals on childhood development, "[t]he effects of early exposure to heavy metals can have long-lasting impacts that may be impossible to reverse."[42]

87.     Due to the impact of Heavy Metals on child development, certain senators have urged the FDA to "finalize action levels that eliminate [] toxic heavy metals."[43]

_____

[39] *Id.*

[40] Morello-Frosch R., Cushing L.J., Jesdale B.M., Schwartz J.M., Guo W., Guo T., Wang M., Harwani S., Petropoulou S.E., Duong W., Park J.S., Petreas M., Gajek R., Alvaran J., She J., Dobraca D., Das R., Woodruff T.J. *Environmental Chemicals in an Urban Population of Pregnant Women and Their Newborns from San Francisco.* Environ Sci Technol. 2016 Nov 15;50(22):12464-12472. doi: 10.1021/acs.est.6b03492. Epub 2016 Oct 26. PMID: 27700069; PMCID: PMC6681912. Available at https://stacks.cdc.gov/view/cdc/80511 (last accessed Feb. 26, 2022).

[41] Jaishankar, M., Tseten, T., Anbalagan, N., Mathew, B. B., & Beeregowda, K. N. (2014). *Toxicity, mechanism and health effects of some heavy metals.* Interdisciplinary toxicology, 7(2), 60–72. Available at https://doi.org/10.2478/intox-2014-0009 (last accessed Feb. 26, 2022).

[42] Consumer Reports: Heavy Metals in Baby Food, *supra.*

[43] https://www.klobuchar.senate.gov/public/_cache/files/9/9/996f2cad-5295-432b-a543-f693129

88.     Because Heavy Metals can bioaccumulate in the body, even regular consumption of small amounts can increase the risk of various health issues, including the risk of bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[44]

89.     Research continues to confirm that exposures to food containing arsenic, lead, mercury, and cadmium causes "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[45]

90.     However, the knowledge of the risks associated with exposure to Heavy Metals is not a new phenomenon. Defendant knew or should have known the risks associated with the presence of Heavy Metals in foods consumed by infants.[46]

91.     Despite the known risks of exposure to Heavy Metals, Defendant has intentionally, recklessly, and/or knowingly sold the Infant Formula without disclosing the presence of risk of arsenic, mercury, cadmium, and lead to consumers like Plaintiffs.

***Arsenic***

92.     The Infant Formula contains (or has a material risk of containing) arsenic, which can cause cognitive deficits in children who are exposed early in life, and even neurological problems in adults who were exposed as infants.[47] "[E]ven low levels of arsenic exposure can

---

88a78/37D015A1AC9DDF0E31B341F629469169.6.22.2021-formatted-letter-to-fda-on-baby-food-recall.pdf (last accessed Feb. 26, 2022) ("Senators' Letter to the FDA").

[44] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[45] HBBF Report, *supra*, at 1.

[46] *See e.g.*, *FDA Compliance Program Guidance Manual: Toxic Elements in Food and Foodware, and Radionuclides in Food- Import and Domestic*, available at http://wayback.archive-it.org/7993/20170404233343/https://www.fda.gov/downloads/Food/ComplianceEnforcement/UCM073204.pdf (last accessed Feb. 26, 2022); *see also* 21 CFR §172, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?CFRPart=172&showFR=1 (last accessed Feb. 26, 2022).

[47] HBBF Report, *supra*, at 13.

impact a baby's neurodevelopment."[48] "Studies have shown that consuming products with arsenic over time can lead to impaired brain development, growth problems, breathing problems, and a compromised immune system."[49]

93.     Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central nervous systems and cognitive development.[50] Exposure to arsenic can also cause diabetes, atherosclerosis, and cardiovascular disease.[51]

94.     Arsenic can cause cancer in humans, as well as diabetes and atherosclerosis, and potentially cardiovascular disease when ingested chronically.[52] Chronic exposure to arsenic has also been associated with dermatological lesions and malignancies.[53]

95.     Moreover, "[t]here is no evidence that the harm caused by arsenic is reversible."[54]

96.     Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and FDA have set limits concerning the allowable

---

[48] Senators' Letter to the FDA, *supra* (citing Dartmouth Toxic Metals Superfund Research Program (2021), Arsenic and Children, https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/).

[49] *Id.*

[50] Congressional Committee Report, *supra*, at 10.

[51] States J.C., Singh A.V., Knudsen T.B., Rouchka E.C., Ngalame N.O., Arteel G.E., et al. (2012) *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis*. PLOS ONE 7(6): e38713. Available at https://doi.org/10.1371/journal.pone.0038713 (last accessed Feb. 26, 2022) ("Prenatal Arsenic Exposure").

[52] *Id.*

[53] Genuis SJ, Schwalfenberg G, Siy A-KJ, Rodushkin I (2012) Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations. PLOS ONE 7(11): e49476. Available at https://doi.org/10.1371/journal.pone.0049676 (last accessed Feb. 27, 2022) ("Toxic Element Contamination of Natural Health Products").

[54] HBBF Report, *supra*, at 3.

limit of arsenic at 10 parts per billion ("ppb") for human consumption in apple juice (regulated by the FDA) and drinking water (regulating by the EPA as a maximum contaminant level). The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[55]

97.     Although the FDA has not set the action level for arsenic in infant formula specifically, "the FDA prioritizes monitoring and regulating products that are more likely to be consumed by very young children."[56] The FDA's limit for bottled water is 5 ppb.[57]

98.     Dr. James E. Rogers, the director of food safety research and testing at Consumer Reports had said "[t]*here is no safe level of heavy metals*, so the goal should be to have no measurable levels of any heavy metal in baby and toddler foods."[58] This rings particularly true when considering that generally, babies who are 12 months or younger heavily rely on infant formula as a key source of nutrients and that unless breastmilk is an option, formula is the only thing babies younger than five months can eat for their development and growth.

99.     Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed arsenic levels at 6.7 ppb, an amount that is especially concerning considering the amount of infant formula consumed by developing children.

---

[55] Toxic Heavy Metals in Popular Baby Foods, *supra*.

[56] FDA, Guidance for Industry: Inorganic Arsenic in Rice Cereals for Infants: Action Level (Apr. 2016), available at https://www.fda.gov/media/97234/download#:~:text=The%20action%20level%20for%20inorganic,on%20sampling%20and%20testing%20results (last accessed Feb. 26, 2022).

[57] 21 C.F.R. §165.110(b)(4)(iii)(A).

[58] Congressional Report Finds More Problems With Heavy Metals in Baby Food (updated Oct. 2021), available at https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/#:~:text=%E2%80%9CThere%20is%20no%20safe%20level,research%20and%20testing%20at%20CR (last accessed March 4, 2022) (emphasis added).

*Cadmium*

100.  The Infant Formula also contains (or has a material risk of containing) cadmium, which has been shown to cause anemia, liver disease, and nerve or brain damage in animals that eat or drink it.

101.  Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage. Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children[.]"[59]

102.  Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[60] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens, and the EPA has likewise determined that cadmium is a probable human carcinogen.[61] Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequesters in [human] tissue."[62]

103.  The EPA has set a maximum contaminant level for cadmium in drinking water of 5 ppb, 40 C.F.R. §141.62; the FDA has set a maximum level in bottled water to 5 ppb; and the WHO set a maximum cadmium level in drinking water to 3 ppb.[63]

104.  Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed cadmium levels as high as 11.4 ppb.

---

[59] HBBF Report, *supra*, at 14.

[60] *Id*.

[61] Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium*, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed Feb. 26, 2022).

[62] Toxic Element Contamination of Natural Health Products, *supra*.

[63] Congressional Committee Report, *supra*, at 29.

*Lead*

105.    The Infant Formula contains (or has a material risk of containing) lead, which is a probable carcinogen.[64]

106.    Lead exposure can seriously harm the brain and nervous system in infants and children and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

107.    Exposure to lead in foods builds up over time. Build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

108.    Even very low exposure levels to lead can "cause lower academic achievement, attention deficits and behavior problems. No safe level of exposure has been identified."[65]

109.    Lead is extremely toxic, and its effects cannot be reversed or remediated.[66]

110.    One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food."[67]  Additionally, studies have established a link between lead exposure and ADHD.[68]

---

[64]American Cancer Society, "Known and Probable Carcinogens," Last Revised August 14, 2019, available at https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html (last accessed Feb. 27, 2022).

[65] HBBF Report, *supra*, at 13.

[66] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[67]  HBBF Report, *supra*, at 7.

[68]Congressional Committee Report, *supra*, at 12.

111.    Although there is no federal standard for lead in baby food, health experts, including the American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports, have agreed that lead in Infant Formula should not exceed 1 ppb.[69]

112.    Despite this, laboratory tests indicate Defendant sold products containing undisclosed lead levels as high as 4.6 ppb.[70]

***Mercury***

113.    The Infant Formula contains (or has a material risk of containing) mercury, which increases the risk for cardiovascular disease. Exposure to mercury has been linked to higher risk of lower IQ scores and intellectual disability.[71]

114.    Although there is no maximum contaminant level for Mercury in infant formula, the EPA has set a maximum contaminant level for Mercury in drinking water at 2 ppb.[72] Regardless, though, "there is no known safe level" of exposure to Mercury as it is a "highly toxic element."[73]

115.    Despite Defendant's packaging claims that its Infant Formula is nutritious, healthy, and made with superior ingredients, laboratory tests indicate Defendant sold Products containing undisclosed mercury levels as high as 10.1 ppb.

116.    The four Heavy Metals – Arsenic, Cadmium, Lead, and Mercury – are significant detriments to children. Of additional concern to developing babies are the health risks due to

---

[69] Toxic Heavy Metals in Popular Baby Foods, *supra*.

[70] HBBF Report at 20, 34, *supra*.

[71] *Id*. at 14.

[72] Congressional Committee Report, *supra*.

[73] Mercury Exposure and Children's Health, *supra.*

exposure to multiple Heavy Metals simultaneously, as "co-exposures can have interactive adverse effects."[74]

117.    The FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its Toxic Elements Working Group, which is aimed toward reducing human exposure to contaminants in dietary supplements, food and cosmetics.[75]

118.    Importantly, and relevant to this lawsuit, action levels do not require disclosure of the presence of Heavy Metals on the packaging of products that are placed in the market. Action levels only set limits for determining when products cannot be placed in the market.

119.    Despite the risk and/or actual presence of these unnatural and potentially harmful chemicals, Defendant fails to disclose the presence of Heavy Metals.

120.    Based on the foregoing, reasonable consumers, like Plaintiffs, would consider the inclusion or risk of inclusion of Heavy Metals a material fact when considering what Infant Formula to purchase.

121.    Defendant knew that monitoring for Heavy Metals in its ingredients and Infant Formula was not only important, but also critical.

122.    Defendant also knew that monitoring Heavy Metals was likewise important to its health-conscious consumers to protect their babies.

---

[74] Morello-Frosch R, Cushing LJ, Jesdale BM, Schwartz JM, Guo W, Guo T, Wang M, Harwani S, Petropoulou SE, Duong W, Park JS, Petreas M, Gajek R, Alvaran J, She J, Dobraca D, Das R, Woodruff TJ. Environmental Chemicals in an Urban Population of Pregnant Women and Their Newborns from San Francisco. Environ Sci Technol. 2016 Nov 15;50(22):12464-12472. doi: 10.1021/acs.est.6b03492. Epub 2016 Oct 26. PMID: 27700069; PMCID: PMC6681912. Available at https://stacks.cdc.gov/view/cdc/80511 (last accessed Feb. 27, 2022).

[75] FDA, "Metals and Your Food," Current as of April 8, 2021, available at https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food (last accessed Feb. 27, 2022).

## IV. Infant Formula Products Can Be Manufactured Without Measurable Levels of Heavy Metals

123. In contrast to the levels of Heavy Metals found in Defendant's Infant Formula, other infant formula manufacturers have produced infant formula that is free of Heavy Metals or with levels that are not measurable.

124. The Clean Label Project tests products for more than 400 contaminants, including heavy metals, chemicals, and plastics, and presents its Purity Award to companies with products with the lowest levels of the contaminants when compared to other products in a given category.[76]

125. Bobbie, a manufacturer of infant formula (recognized by the Clean Label Project for manufacturing products that were free from Heavy Metals) was a recipient of the Clean Label Project's Purity Award.[77]

126. Additionally, testing by Consumer Reports identified baby food products with Heavy Metal levels low enough to not cause concern, as well as some products with Heavy Metal levels that were not measurable.[78] "[T]here are ways for [baby food] manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[79]

127. In testing conducted by Consumer Reports, approximately one-third of tested products had levels of Heavy Metals that were below levels of concern and other products had immeasurable levels of Heavy Metals.[80] As stated by Dr. James E. Rogers, the Consumer Reports

---

[76] https://cleanlabelproject.org/purity-award/ (last accessed Feb. 26, 2022).

[77] https://www.businesswire.com/news/home/20220125005905/en/Bobbie-Is-First-Ever-Infant-Formula-To-Receive-The-Clean-Label-Project-Purity-Award-and-Certification-as-a-Pesticide-Free-Product (last accessed Feb. 26, 2022).

[78] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[79] *Id*.

[80] *Id*.

Director of Food Safety Research and Testing, "Every category of food was represented in that lower-risk group. That indicates that there are ways for manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[81]

128.    The FDA Total Diet Study also demonstrated that infant formula can be manufactured without detectable levels of Heavy Metals.[82]

129.    In addition, because of public health efforts, exposure to lead has consistently and notably decreased over the past 40 years.[83] These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[84] The progress towards decreasing childhood exposure to lead was so impressive that the CDC identified "childhood lead poisoning prevention as 1 of 10 great U.S. public health achievements during 2001 to 2010."[85]

130.    Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formula in order to achieve non-detectable or zero levels by adequately monitoring its ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained higher levels of Heavy Metals.

131.    Defendant also knew it was not monitoring and testing for Heavy Metals in the Infant Formula. Defendant knew its failure to monitor and test for Heavy Metals in the Infant Formula continued throughout the Class Period.

---

[81] *Id.*

[82] FDA Total Diet Study, *supra*, at 7, 10, 17, 20, 68, 71, 95-96.

[83] Dignam, T., Kaufmann, R. B., LeStourgeon, L., & Brown, M. J. (2019). *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure*. Journal of public health management and practice: JPHMP, 25 Suppl 1, Lead Poisoning Prevention (Suppl 1 LEAD POISONING PREVENTION), S13–S22. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed Feb. 27, 2022).

[84] *Id.*

[85] *Id.*

132.    Defendant's marketing was misleading due to its failure to properly and sufficiently monitor and test for Heavy Metals and for failure to disclose the presence or risk of presence of Heavy Metals in the Infant Formula.

133.    Defendant knew or should have known consumers paid the price premium and expected Defendant to test and monitor for Heavy Metals and disclose the presence or risk of Heavy Metals in the Infant Formula and ingredients.

134.    At all times during the Class Period, Defendant did not monitor or test for Heavy Metals in the Infant Formula and ingredients and Defendant did not disclose the presence or risk of Heavy Metals in its Products.

135.    Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals in the Infant Formula and ingredients, and to disclose the presence or risk of any levels of Heavy Metals in its Products.

136.    Defendant knew or should have known the Infant Formula contained or risked containing Heavy Metals that were inconsistent with its marketing.

137.    Defendant knew or should have known that, in order to comply with its marketing, consumers expected them to ensure the Infant Formula was monitored and tested for Heavy Metals, and to disclose the presence or risk of Heavy Metals.

138.    Defendant knew, yet failed to disclose, its lack of testing and knowledge of the risk or presence of Heavy Metals in the Infant Formula's ingredients.

139.    Defendant's above-referenced Omissions are false, misleading, and crafted to deceive the public as they create an image that the Infant Formula are nutritious and free of Heavy Metals.

140.     Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Products.  Defendant's nondisclosure and/or concealment of the presence or risk of Heavy Metals in the Infant Formula alleged herein intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class, to purchase Products they would not have if the true quality and ingredients were disclosed.

## V.      The Material Omissions Misled and Deceived Reasonable Consumers

141.     The Omissions wrongfully convey to consumers that Defendant's Infant Formula has certain superior quality and characteristics that it does not actually possess.

142.     For instance, although Defendant misleadingly causes consumers to believe its Infant Formula does not contain Heavy Metals due to the material Omissions, the Infant Formula does in fact contain undisclosed levels of Heavy Metals, which is material information to reasonable consumers.

143.     Three of Defendant's Infant Formulas were tested and that testing showed the presence of undisclosed Heavy Metals at the following levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) | Mercury (ppb) |
|---|---|---|---|---|
| Similac® Soy Isomil | 6.0 | 11.4 | 2.9 | <1.8 |
| Similac® 360 Total Care | 6.7 | 1.4 | 1.5 | <1.8 |
| Similac® Pro Advance | 2.5 | <1.3 | 3.0 | 10.1 |

144.     As stated herein, no level of Heavy Metals is safe.[86]

---

[86] Some Baby Food May Contain Toxic Metals, *supra*.

145. Based on the Omissions, a reasonable consumer would not suspect the presence of Heavy Metals, nor would a reasonable consumer be able to detect the presence of Heavy Metals, in the Infant Formula without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

146. Reasonable consumers must and do rely on Defendant to honestly report what its Infant Formula contains.

147. Based on the impression given by the packaging, no reasonable consumer could expect or understand that the Infant Formula contained Heavy Metals.

148. In light of Defendant's statements regarding the quality of the Infant Formula, including its commitment to innovative Formula and superior ingredients, Defendant knew or should have known the Infant Formula contained or may contain Heavy Metals.

149. Defendant had a duty to ensure the Infant Formula was not deceptively, misleadingly, unfairly, and/or falsely marketed and all material information was properly and fully disclosed.

150. Defendant acted knowingly, recklessly, and/or intentionally with its deceptive packaging based on the material Omissions.

151. Defendant knew that properly and sufficiently monitoring the Infant Formula for Heavy Metals in its ingredients and finished Infant Formula was not only important, but also critical.

152. Additionally, Defendant knew or should have been aware that a reasonable consumer would be feeding the Infant Formula multiple times each day to his or her child, making it a significant source of food and nutrition for the child. This leads to repeated exposure to the Heavy Metals to the child.

153. Finally, Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formula by properly monitoring its ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained or may contain higher levels of Heavy Metals.

154. The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions.

155. The Omissions make the Infant Formula's packaging deceptive based on the presence or risk of Heavy Metals in the Infant Formula. Reasonable consumers, like Plaintiffs, would consider the mere presence or risk of Heavy Metals in the Infant Formula a material fact when considering what infant formula to purchase.

156. At all times during and throughout the Class Period, Defendant knew it was not sufficiently and consistently monitoring or testing the Infant Formula or its ingredients for Heavy Metals.

157. Defendant knew, yet failed to disclose, its lack of regular testing, monitoring, and knowledge that the Infant Formula and/or ingredients used in the Infant Formula included undisclosed levels of Heavy Metals.

158. Defendant's packaging was misleading due to Defendant's failure to properly and sufficiently monitor for and to disclose the risk of the presence of Heavy Metals in the Infant Formula.

159. Defendant knew or should have known the Infant Formula contained or may contain undisclosed levels of Heavy Metals that was inconsistent with its packaging.

160. Defendant knew or should have known that reasonable consumers expected it to ensure the Infant Formula and ingredients were monitored and tested for Heavy Metals to ensure compliance with their packaging.

161.    Defendant knew or should have known consumers paid premium prices and expected Defendant to regularly test for Heavy Metals and sufficiently monitor the Infant Formula and ingredients for the presence of Heavy Metals.

162.    The Omissions are material and render the Infant Formula's packaging deceptive as without full disclosure, reasonable consumers believe the Infant Formula is high quality, healthy, nutritious, and a superior product, and is free of Heavy Metals.

163.    Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt or question Defendant's statements regarding the quality of the Infant Formula. Based on the impression given by the packaging, no reasonable consumer could expect or understand that the Infant Formula contained Heavy Metals.

164.    The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class, to purchase products they would not have if the true quality and ingredients were disclosed or for which they would not have paid a premium price.

165.    As a result of Defendant's deceptive packaging of the Infant Formula, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, consumers who paid the purchase price or premium for the Infant Formula that was not as advertised.

## PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT

166.    Plaintiffs read and relied upon the packaging of the Infant Formula when making their purchasing decisions. Had they known Defendant omitted and failed to disclose the presence of Heavy Metals from its packaging, they would not have purchased the Infant Formula.

167.    A reasonable consumer would consider the packaging of a product when deciding whether to purchase it.

## DEFENDANT'S KNOWLEDGE AND NOTICE OF ITS BREACH OF ITS IMPLIED WARRANTIES

168.    Defendant had sufficient notice of its breach of implied warranties.  Defendant has, and had, exclusive knowledge of the physical and chemical make-up of the Infant Formula, and whether the ingredients contained Heavy Metals.

169.    Moreover, Defendant was put on notice by February and September of 2021, when Congress publicly released findings regarding the presence of Heavy Metals in baby foods.[87] The FDA has also released a study showing the presence of Heavy Metals in baby foods, including infant formula.[88]

170.    Defendant did not change its packaging to include any disclaimer that the Infant Formula included levels of Heavy Metals.

## PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASS

171.    Defendant knew that reasonable consumers such as Plaintiffs and the proposed Class members would be the end purchasers of the Infant Formula and the targets of its advertising, marketing, and statements.

172.    Defendant intended that the packaging and implied warranties would be considered by the end purchasers of the Infant Formula, including Plaintiffs and the proposed Class members.

173.    Defendant directly marketed to Plaintiffs and the proposed Class through its packaging.

174.    Plaintiffs and the proposed Class members are the intended beneficiaries of the implied warranties.

---

[87] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[88] FDA Total Diet Study, *supra*, at 7, 10, 17, 20, 68, 71, 95-96.

## APPLICABILITY OF EQUITABLE TOLLING AND
## THE DISCOVERY RULE TO THE STATUTE OF LIMITATIONS

175.    Fraudulent concealment and/or the discovery rule toll Plaintiffs' claims.

176.    The statute of limitations is tolled for the Plaintiffs' Illinois Consumer Fraud and Deceptive Business Practices Act and common law claims due to Defendant's fraudulent concealment of the presence (or risk) of Heavy Metals in its Infant Formula.

177.    Defendant intentionally concealed material facts to Plaintiffs when it omitted the presence (or risk) of Heavy Metals in its Infant Formula.

178.    Defendant knew the presence or risk of Heavy Metals in its Infant Formula is a material consideration for any parent buying infant Formula.

179.    Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act by deceiving customers as to the true nature as to the quality and makeup of the Infant Formula.

180.    The discovery rule also tolls Plaintiffs' Illinois Consumer Fraud and Deceptive Business Practices Act and unjust enrichment claims.

181.    Based on Defendant concealing material facts from Plaintiffs, Plaintiffs could not reasonably discover the presence of Heavy Metals in Defendant's Infant Formula unless they conducted independent testing.

182.    Plaintiffs did not know of the presence (or risk) of Heavy Metals in Defendant's Infant Formula because Defendant did not disclose the presence (or risk) of Heavy Metals on the Products' packaging. Instead, Defendant omitted this information while only representing that the Infant Formula was healthy, nutritious, and made of high quality to support growing infants, whom Defendants knew or should have known are most vulnerable to toxins.

## CLASS ACTION ALLEGATIONS

183.    Plaintiffs bring this action individually and on behalf of the following Class pursuant to Rules 23(a), 23(b)(2) and (3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons in the United States who, from March 16, 2016 to the present, purchased the Infant Formula for household use, and not for resale (the "Class").

184.    Plaintiff Doxie brings this action individually and on behalf of the following California Subclass:

> All persons who are citizens of California who, from March 16, 2016 to the present, purchased the Infant Formula for household use, and not for resale (the "California Subclass").

185.    Plaintiff Gray brings this action individually and on behalf of the following Hawaii Subclass:

> All persons who are citizens of Hawaii who, from March 16, 2016 to the present, purchased the Infant Formula for household use, and not for resale (the "Hawaii Subclass").

186.    Plaintiff Helmick brings this action individually and on behalf of the following Nebraska Subclass:

> All persons who are citizens of Nebraska who, from March 16, 2016 to the present, purchased the Infant Formula for household use, and not for resale (the "Nebraska Subclass").

187.    Plaintiff Holloway brings this action individually and on behalf of the following Texas Subclass:

> All persons who are citizens of Texas who, from March 16, 2016 to the present, purchased the Infant Formula for household use, and not for resale (the "Texas Subclass").

188.    Plaintiff Popa brings this action individually and on behalf of the following Pennsylvania Subclass:

> All persons who are citizens of Pennsylvania who, from March 15, 2016 to the present, purchased the Infant Formula for household use, and not for resale (the "Pennsylvania Subclass").

189. Plaintiff Revord brings this action individually and on behalf of the following Michigan Subclass:

> All persons who are citizens of Michigan who, from March 16, 2016 to the present, purchased the Infant Formula for household use, and not for resale (the "Michigan Subclass").

190. Collectively, the California, Hawaii, Nebraska, Texas, Pennsylvania and Michigan Subclasses are referred to as State Subclasses. Excluded from the Class and each State Subclass (collectively, "Classes") are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

191. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

192. The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

193. Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

> (a)    whether Defendant owed a duty of care;

> (b)    whether Defendant owed a duty to disclose;

> (c)    whether Defendant knew or should have known that the Infant Formula contained or may contain Heavy Metals;

(d)     whether Defendant failed to disclose that the Infant Formula contained or may contain Heavy Metals;

(e)     whether the claims of the Plaintiffs and the Classes serve a public benefit;

(f)     whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

(g)     whether the Omissions are material to a reasonable consumer;

(h)     whether the inclusion of Heavy Metals in the Infant Formula is material to a reasonable consumer;

(i)     whether the Omissions are likely to deceive a reasonable consumer;

(j)     whether Defendant had knowledge that the Omissions were material and false, deceptive, and misleading;

(k)     whether Defendant breached its duty of care;

(l)     whether Defendant breached its duty to disclose;

(m)     whether Defendant violated the laws of the state of California and/or Hawaii, and/or Nebraska, and/or Texas, and/or Pennsylvania and/or Michigan;

(n)     whether Defendant breached its implied warranties;

(o)     whether Defendant engaged in unfair trade practices;

(p)     whether Defendant engaged in false advertising;

(q)     whether Defendant made fraudulent omissions;

(r)     Whether Plaintiff and Class members' claims are tolled based on Defendant's fraudulent concealment;

(s)     whether Plaintiffs and members of the Classes are entitled to actual, statutory, and punitive damages; and

(t)      whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

194.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

195.     Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

196.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes, has no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

197.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

198.     Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

199.     As a result of the foregoing, class treatment is appropriate.

### CLAIMS FOR RELIEF

### COUNT I
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §505/1, *et seq.*, Against Defendant on Behalf of the Class

200.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

201. Plaintiffs and the Class are a "person" within the meaning of 815 Ill. Comp. Stat. §505/1(c).

202. Defendant is a "person" within the meaning of 815 Ill. Comp. Stat. §505/1(c).

203. The Infant Formula is "merchandise" within the meaning of 815 Ill. Comp. Stat. §505/1(b).

204. There was a sale of merchandise within the meaning of 815 Ill. Comp. Stat. §505/1(d).

205. The conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §505/1, *et seq*. ("ICFA").

206. Defendant engaged in a deceptive act or practice in violation of ICFA by knowingly concealing, omitting, or failing to disclose the Infant Formula's true quality, ingredients, and unsuitability for consumption by infants.

207. Defendant's deceptive acts and practices are continuing.

208. Defendant intended for Plaintiffs and the Class members to rely on and accept as true the Products' packaging and Omissions in deciding whether to purchase the Infant Formula, and at what price.

209. Defendant's concealment, Omissions, and other deceptive conduct were likely to deceive consumers with respect to the Infant Formula's quality, ingredients, and unsuitability for consumption by infants.

210. Defendant's concealment, Omissions, and other deceptive conduct were likely to cause consumers to purchase and/or overpay for the Infant Formula.

211. Defendant's concealment, Omissions, and other deceptive acts occurred before Plaintiffs and the Class decided to purchase the Infant Formula.

212. Defendant's concealment, Omissions, and other deceptive conduct did in fact deceive Plaintiffs and the Class with respect to the Infant Formula's quality, ingredients, and unsuitability for consumption by infants.

213. Defendant's concealment, Omissions, and other deceptive conduct did in fact deceive and cause Plaintiffs and the Class members to purchase and/or overpay for the Infant Formula.

214. Defendant's concealment, Omissions, and other deceptive conduct described herein repeatedly occurred in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

215. The facts concealed, omitted, or not disclosed by Defendant with respect to the presence of Heavy Metals that do not conform to the packaging are material facts because Plaintiffs and any reasonable consumer would have considered those facts important in deciding whether to purchase the Infant Formula, and at what price.

216. If Plaintiffs and the Class members had known that the Infant Formula did not in fact match the quality and ingredients described above, they would not have paid the price premium they paid for the Infant Formula.

217. If Plaintiffs and the Class members had known that the Infant Formula did not in fact match the quality and ingredients described above, they would not have purchased the Infant Formula at all.

218. As a result of Defendant's conduct, Plaintiffs and the Class members have suffered actual damages, in that they purchased Infant Formula at a price far greater than they would have paid if they had knowledge of the presence of Heavy Metals that do not conform to the Infant Formula's packaging.

219.     As a result of Defendant's conduct, Plaintiffs and the Class members have suffered actual damages, in that they purchased Infant Formula that they would not have purchased at all if they had knowledge of the presence of Heavy Metals that do not conform to the Infant Formula's packaging.

220.     As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendant set forth above, Plaintiffs and the Class members are entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs, as set forth in Section 10a of the ICFA.

221.     Defendant's deceptive, misleading, unfair, and unconscionable practices set forth above were done willfully, wantonly, and maliciously, entitling Plaintiffs and the Class members to an award of punitive damages.

**COUNT II**
**Breach of Implied Warranty of Merchantability Against**
**Defendant on Behalf of the Class or, Alternatively, the State**
**Subclasses**

222.     Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

223.     Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Class.

224.     There was a sale of goods from Defendant to Plaintiffs and the members of the Classes.

225.     At all times mentioned herein, Defendant manufactured and sold the Infant Formula, and prior to the time the Infant Formula was purchased by Plaintiffs and the Classes, impliedly warranted that the Infant Formula was of merchantable quality and fit for its ordinary use (consumption by infants with no development or health risks).

226.     Plaintiffs and the Classes relied on these implied warranties when they purchased

the Infant Formula.

227.    The Infant Formula was not fit for its ordinary use (consumption by infants with no development or health risks) as it includes undisclosed levels of Heavy Metals that do not conform to the packaging.

228.    These promises became part of the basis of the bargain between Defendant and Plaintiffs and the members of the Classes, and thus constituted implied warranties.

229.    Defendant breached the implied warranties by selling Infant Formula that contains Heavy Metals.

230.    Defendant was on notice of this breach as it was aware of the inclusion of Heavy Metals.

231.    Privity exists because Defendant impliedly warranted to Plaintiffs and the members of the Classes that the Infant Formula was healthy, nutritious, and safe for consumption and by failing to mention or disclose the presence of Heavy Metals.

232.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and the Classes suffered actual damages as they purchased the Infant Formula that was worth less than the price paid and that they would not have purchased at all had they known of the presence of Heavy Metals.

233.    Plaintiffs, on behalf of themselves and the Classes, seek actual damages for Defendant's failure to deliver goods that conform to their implied warranties and resulting breach.


## COUNT III
### Fraudulent Misrepresentation by Omission Against Defendant on Behalf of the Class or, Alternatively, on Behalf of the State Subclasses

234.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

235.     Plaintiffs and members of the Classes were buyers and Defendant was a seller in a commercial exchange.

236.     Plaintiffs and the Classes were ordinary non-business consumers who trusted Defendant to manufacture, distribute, market, and sell Infant Formula to be free of Heavy Metals.

237.     As an Infant Formula manufacturer, Defendant is in a special position of trust upon which consumers rely.

238.     Defendant failed to disclose that the Infant Formula contained (or has a material risk of containing) Heavy Metals.

239.     Defendant intentionally, knowingly, and/or recklessly made these Omissions to induce Plaintiffs and the Classes to purchase the Infant Formula.

240.     Defendant knew or should have known the Infant Formula included undisclosed levels of Heavy Metals.

241.     Defendant allowed its packaging to intentionally mislead consumers, such as Plaintiffs and the Classes.

242.     Defendant's packaging that omitted the presence of Heavy Metals in the Infant Formula was made with the intent to deceive and defraud consumers, such as Plaintiffs and the Classes.

243.     Defendant intended for Plaintiffs and the Classes to rely on the Omissions. Defendant knows its customers trust the quality of its Products and that it is in a special position of trust with the public.

244.     Defendant knows reasonable consumers expected the Infant Formula to be free of Heavy Metals.

245. Defendant also knows that reasonable consumers seek out and wish to purchase premium Infant Formula that possess high quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay more for Infant Formula they believe possess these qualities.

246. Defendant knew that Plaintiffs and the Classes were ignorant of the presence (or material risk) of Heavy Metals in the Infant Formula.

247. Defendant knew that Plaintiffs and the Classes could not reasonably have been expected to learn or discover that the Infant Formula's packaging omitted the presence of Heavy Metals prior to purchasing the Infant Formula.

248. Defendant was under a duty to disclose the presence (or material risk) of Heavy Metals in its Infant Formula to Plaintiffs and the Classes because:

(a) Defendant was in possession of special facts that could not have been discovered by Plaintiffs and the Classes.

(b) Defendant's packaging disclosed misleading information to consumers by omitting the presence (or material risk) of Heavy Metals in its Infant Formula.

(c) Based on Defendant's partial statements on the Infant Formula's packaging that gave a misleading impression to reasonable consumers without further information on the presence of Heavy Metals, which was not disclosed, Defendant assumed the obligation to make a full and fair disclosure of the whole truth.

249. The presence (or material risk) of Heavy Metals in Defendant's Infant Formula was a material fact to Plaintiffs and the Classes as Plaintiffs and the Classes relied on the Omissions when purchasing the Infant Formula.

250. Plaintiffs and the Classes had a right to rely on Defendant's packaging as the truth because customers like Plaintiffs and the Classes trust the quality of Defendant's Products and they expect the Infant Formula to be free of Heavy Metals and seek out and wish to purchase premium Infant Formula that possess high quality ingredients free of Heavy Metals.

251. Plaintiffs and the Classes did in fact rely on the material Omissions and purchased the Infant Formula to their detriment. Given the materiality of the Omissions, Plaintiffs' and the Classes' reliance on the Omissions was justifiable.

252. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Classes suffered actual pecuniary damages in that they purchased Infant Formula that was worth less than the price they paid and that they would not have purchased at all had they known the Infant Formula included undisclosed Heavy Metals that do not conform to the Products' packaging.

253. Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### COUNT IV
### Fraud by Omission Against Defendant on Behalf of the Class
### or, Alternatively, the State Subclasses

254. Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

255. Defendant knew or should have known the Infant Formula contained or may contain undisclosed levels of Heavy Metals.

256. Plaintiffs and the Classes and Defendant acted within the context of a business transaction when Plaintiffs and the Classes purchased Defendant's Infant Formula for household or business use, and not for resale.

257. Plaintiffs and the Classes were ordinary non-business consumers.

258.    Defendant actively and knowingly concealed from and failed to disclose to Plaintiffs and the Classes that the Infant Formula included undisclosed levels of Heavy Metals that do not conform to the Products' packaging.

259.    As an infant formula manufacturer, Defendant is in a special position of trust upon which consumers rely.

260.    Defendant was under a duty to disclose to Plaintiffs and the Classes the true quality, characteristics, ingredients and suitability of the Infant Formula because:

        (a)    Defendant was in a superior position to know the true state of facts about its Products;

        (b)    Defendant was in a superior position to know the actual ingredients, characteristics, and unsuitability of the Infant Formula for consumption by infants; and

        (c)    Defendant knew that Plaintiffs and the Classes could not reasonably have been expected to learn or discover the presence or risk of inclusion of Heavy Metals without Defendant disclosing it on the Infant Formula's packaging.

261.    Defendant knows its customers trust the quality of its products and they expect Defendant's Infant Formula to be free of Heavy Metals. Defendant also knows that certain consumers seek out and wish to purchase premium Infant Formula that possess high quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay more for Infant Formula that they believe possesses these qualities.

262.    Due to the Omissions on the Infant Formula's packaging, Defendant had a duty to disclose the whole truth about the presence of Heavy Metals and/or other undesirable toxins or contaminants in the Infant Formula to Plaintiffs and the Classes.

263.    Defendant acted in bad faith when it intended that Plaintiffs and the Classes would rely on the Omissions when purchasing the Infant Formula, unaware of the undisclosed material facts.

264.    Defendant was under a duty to disclose the presence of Heavy Metals because Defendant undertook the disclosure of information about the Infant Formula on the Infant Formula's packaging.

265.    Defendant failed to discharge its duty to disclose the presence of Heavy Metals in the Infant Formula.

266.    Defendant allowed the Omissions on the Products' packaging to intentionally mislead consumers, such as Plaintiffs and the Classes.

267.    The facts concealed, omitted, or not disclosed by Defendant to Plaintiffs and the Classes are material in that a reasonable consumer would have considered the presence (or risk) of Heavy Metals important when deciding whether to purchase the Infant Formula.

268.    Defendant knew or should have known the Omissions were material to Plaintiffs' and the Classes' decisions to purchase the Infant Formula and would induce Plaintiffs and the Classes to purchase the Infant Formula.

269.    Defendant intentionally concealed the presence of Heavy Metals in the Infant Formula with intent to defraud and deceive Plaintiffs and the Classes.

270.    Plaintiffs and the Classes justifiably relied on Defendant's Omissions to their detriment. The detriment is evident from the true quality, characteristics, and ingredients of the Infant Formula, which is misleading when compared to the Infant Formula's packaging and as represented by Defendant and inherently unfair to consumers of the Infant Formula, such as Plaintiffs and the Classes.

271.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Classes suffered actual damages in that they purchased Infant Formula that was worth less than the price they paid and that they would not have purchased at all had they known Infant Formula included undisclosed levels of Heavy Metals that do not conform to the Products' packaging.

272.    Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### COUNT V
**Unjust Enrichment Against Defendant on Behalf of the Class
or, Alternatively, the State Subclasses**

273.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

274.    Substantial benefits have been conferred on Defendant by Plaintiffs and the Classes through the purchase of the Infant Formula. Defendant knowingly and willingly accepted and enjoyed these benefits.

275.    Defendant either knew or should have known that the payments rendered by Plaintiffs and the Classes were given and received with the expectation that the Infant Formula would not contain Heavy Metals. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

276.    Defendant was obligated to disclose the presence of Heavy Metals in the Infant Formula because:

(a)     Defendant had exclusive knowledge of the presence of Heavy Metals in the Infant Formula that were not known or reasonably accessible to the Plaintiffs and the Classes;

(b)     Defendant actively concealed the presence of Heavy Metals from the Plaintiffs and the Classes; and

(c)     Defendant made partial statements on the Infant Formula' packaging that gave a misleading impression to reasonable consumers without further information because the presence of Heavy Metal had not been disclosed.

277.    Defendant's acceptance and retention of the benefits of the payments from Plaintiff and the Classes under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the Classes.

278.    Plaintiffs and the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

279.    Plaintiffs and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**COUNT VI**
**Violations of California's Consumers Legal Remedies Act,**
**California Civil Code §§1750, et seq.,**
**(on Behalf of Plaintiff Doxie and the California Subclass)**

280.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

281.    Plaintiff Doxie and each proposed California Subclass member is a "consumer," as that term is defined in California Civil Code section 1761(d).

282.    The Infant Formula Products are "goods," as that term is defined in California Civil Code section 1761(a).

283.    Defendant is a "person" as that term is defined in California Civil Code section 1761(c).

284.    Plaintiff Doxie and each proposed California Subclass member's purchase of Defendant's products constituted a "transaction" as that term is defined in California Civil Code section 1761(e).

285.    Defendant's conduct alleged herein violates the following provisions of California's Consumers Legal Remedies Act (the "CLRA"):

a.    California Civil Code section 1770(a)(5), by negligently, recklessly, and/or intentionally failing to disclose the presence or risk of Heavy Metals in the Products;

b.    California Civil Code section 1770(a)(7), by negligently, recklessly, and/or intentionally representing that the Infant Formula was of a particular standard, quality, or grade, when it was of another;

c.    California Civil Code section 1770(a)(9), by negligently, recklessly, and/or intentionally advertising the Infant Formula with intent not to sell it as advertised; and

d.    California Civil Code section 1770(a) (16), by representing that the Infant Formula has been supplied in accordance with previous representations when it has not.

286.    As a direct and proximate result of these violations, Plaintiff Doxie and the California Subclass have been harmed, and that harm will continue unless Defendant is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Products.

287.    Plaintiff Doxie gave written notice and a demand upon Defendant pursuant to the CLRA by certified letter dated March 11, 2022, and seeks injunctive relief herein and will amend this complaint to include claims for damages after the expiration of 30 days.

288.     Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Doxie's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

289.     Plaintiff Doxie, on behalf of herself and the California Subclass, seeks an award of attorneys' fees pursuant to, *inter alia*, California Civil Code section 1780(e) and California Code of Civil Procedure section 1021.5.

## COUNT VII
**Violations of California False Advertising Law, California Business & Professions Code §§17500, *et seq*.,
(on Behalf of Plaintiff Doxie and the California Subclass)**

290.     Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

291.     California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

292.     As set forth herein, Defendant's Omissions that the Products contained or risked containing Heavy Metals were false and likely to deceive the public.

293.     Defendant failed to disclose the presence or risk of Heavy Metals in the Products.

294.     Defendant knew, or reasonably should have known, that these Omissions were untrue or misleading.

295.     Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Doxie's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

296.     Plaintiff Doxie and members of the California Subclass are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Products.

<u>**COUNT VIII**</u>
**Violations of the Unfair Competition Law, California Business & Professions
Code §§17200, *et seq.*,
(on Behalf of Plaintiff Doxie and the California Subclass)**

297.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

298.    The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200:

**Fraudulent**

299.    Defendant failed to  disclose the presence or risk of Heavy Metals in the Products.

**Unlawful**

300.    As alleged herein, Defendant has advertised the Infant Formula with false or misleading Omissions, such that Defendant's actions violate at least the following laws:

•       The CLRA, California Business & Professions Code sections 1750, et seq.; and

•       The False Advertising Law, California Business & Professions Code sections 17500, et seq.

**Unfair**

301.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

302.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is also unfair because it violates public policy as declared by

specific constitutional, statutory, or regulatory provisions, including, but not limited to, the False Advertising Law and the CLRA.

303.    Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves can reasonably avoid.

304.    In accordance with California Business & Professions Code section 17203, Plaintiff Doxie, on behalf of herself and the California Subclass, seeks an order enjoining Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.  Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Doxie's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

305.    Plaintiff Doxie, on behalf of herself and the Calfornia Subclass, also seeks an order for the restitution of all monies from the sale the Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

**<u>COUNT IX</u>**
**Breach Of The Implied Warranty Of Merchantability – California Uniform**
**Commercial Code**
**(Cal. Comm. Code § 2314)**
**(on Behalf of Plaintiff Doxie and the California Subclass)**

306.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

307.    This claim is brought by Plaintiff Doxie on behalf of herself and the California Subclass members.

308. Defendant is and was at all relevant times a merchant as defined by Cal. Comm. Code § 2104.

309. A warranty that the Products were in merchantable condition is implied by law pursuant to California Comm. Code § 2314.

310. Plaintiff Doxie and the members of the California Subclass purchased the Products manufactured and marketed by Defendant by and through Defendant's authorized sellers for retail or online sale to consumers. At all relevant times, Defendant was the merchant, manufacturer, marketer, warrantor, and/or seller of the Products. Defendant knew or had reason to know of the specific use for which its Products were purchased.

311. The Products are and were at all relevant times goods within the meaning of Cal. Comm. Code § 2105.

312. Defendant impliedly warranted that the Products were in merchantable condition and fit for consumption or ingestion by babies. The Products when sold at all times thereafter were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and healthy nourishment for babies. The Products are not safe for babies. Thus, Defendant breached its implied warranty of merchantability for the ordinary purpose for which the Products are purchased and used.

313. Defendant cannot disclaim its implied warranty as it knowingly sold Products that contained or risked containing Heavy Metals without disclosure of same.

314. Defendant was provided notice by letter as described above as well as by the numerous consumer class action complaints filed against it. Affording any further opportunity to cure its breach of implied warranties would be unnecessary and futile here because Abbott has known of and concealed the safety risks attendant to the Infant Formula Products.

315.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Doxie and members of the California Subclass have been damaged in an amount to be proven at trial.

316.    Plaintiff Doxie and members of the California Subclass have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

**COUNT X**
**Violation of the Hawaii Uniform Deceptive Trade Practices Act (Haw. Rev. Stat. §§ 448-1, *et seq.*)**
**(on Behalf of Plaintiff Gray and the Hawaii Subclass)**

317.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

318.    Plaintiff Gray brings this Court individually and on behalf of the Hawaii Subclass.

319.    Hawaii's Uniform Deceptive Trade Practices Act ("Hawaii UDTPA") provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

320.    Hawaii's UDTPA further provides that any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter may sue for damages sustained by the person.

321.    At all relevant times, Plaintiff Gray and the members of the Hawaii Subclass were natural persons who, primarily for personal, family, or household purposes, purchased Defendant's goods or services.

322.    At all relevant times, Defendant and Plaintiff Gray and the members of the Hawaii Subclass were either individuals, corporations, firms, trusts, partnerships, limited partnerships, limited liability partnerships, limited liability limited partnerships, limited liability companies, and incorporated or unincorporated associations.

323.    Defendant willfully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Haw. Rev. Stat. § 480-2 as described in the allegations above.

324.    Defendant's Omissions in the sale of its Products as detailed above are an act or practice in the conduct of trade or commerce.

325.    Defendant's Omissions in the sale of its Products as detailed above impact the public interest.

326.    Plaintiff Gray and Hawaii Subclass members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's Products or would have paid less for those Products.

327.    Instead, as a result of Defendant's Omissions, Plaintiff Gray and Hawaii Subclass members suffered monetary losses in that (1) the actual value of the Products they received was less than the value of the Products as represented denying them of the benefit of their bargain; and (2) Plaintiff Gray and Hawaii Subclass members paid more than the fair market value of the Products they received causing them out-of-pocket damages.

328.    Defendant's Omissions in the sale of its Products as detailed above are unfair because they are inequitably enriching Defendant at the expense of Plaintiff Gray and the Hawaii Subclass.

329.    Defendant's Omissions in the sale of its Products as detailed above are unfair because they offend public policy and cause consumers substantial injury.

330.     Defendant's Omissions in the sale of its Products as detailed above is unfair in that it violates the well-established public policies of protecting babies from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

331.     Plaintiff Gray and the Hawaii Subclass have suffered economic injury as a direct and proximate results of Defendant's conduct.

332.     Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Gray's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

333.     As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which it would not have received if it had not engaged in the violations described in this Complaint.

### COUNT XI
**Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 P.S. §§ 201-1 et seq.**
**(on behalf of Plaintiff Popa and the Pennsylvania Subclass)**

334.     Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

335.     Plaintiff Popa brings this claim individually and on behalf of the members of the proposed Pennsylvania Subclass against Defendant for violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, *et seq*.

336.     Plaintiff Popa, Defendant, and members of the Pennsylvania Subclass are "Person[s]" within the meaning of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2(2).

337. 73 P.S. § 201-3 declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce .... "

338. Defendant's business acts and practices alleged herein constituted deceptive acts or practices under the 73 P.S. § 201, *et seq.*

339. Defendant has known or reasonably should have known that the Products contained unsafe levels of toxic heavy metals, and that Plaintiff Popa and other members of the Pennsylvania Subclass would reasonably and justifiably rely on the packaging in purchasing the Products.

340. Defendant has intentionally and knowingly omitted material facts with an intent to mislead Plaintiff Popa and the Pennsylvania Subclass.

341. The above unlawful, unfair, and deceptive acts and practices by Defendant were immoral, unethical, oppressive and unscrupulous. These acts caused substantial injury to Plaintiff Popa and the Pennsylvania Subclass that they could not reasonably avoid, and this substantial injury outweighed any benefits to consumers or to competition.

342. Defendant's omissions were material to Plaintiff Popa and the Pennsylvania Subclass because they relate to the quality and safety of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchase decisions.

343. As a direct and proximate cause of Defendant's conduct, Plaintiff Popa and members of the Pennsylvania Subclass suffered damages as alleged above.

344. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Popa's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

345.    Plaintiff Popa and the Pennsylvania Subclass seek an order enjoining Defendant's deceptive acts and practices, and awarding attorneys' fees, and any other just and proper relief available under the UTPCPL.

346.    In addition to or in lieu of actual damages, Plaintiff Popa and the Pennsylvania Subclass seek statutory damages for each injury and violation which has occurred.  Plaintiff Popa and the Pennsylvania Subclass seek relief under 73 P.S. § 201-9.2, including, but not limited to, injunctive relief, actual damages or $100 per Class Member, whichever is greater, treble damages, and attorneys' fees and costs.

## COUNT XII
### Michigan Consumer Protection Act
### MCL §§ 445 et seq.
### (on behalf of Plaintiff Revord and the Michigan Subclass)

347.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein

348.    Plaintiff Revord and Michigan Subclass members are residents and citizen of the State of Michigan at all times mentioned herein.

349.    Defendant engaged in "trade or commerce" in Michigan, as defined by MCL § 445.902(g), in that it provided goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited, offered for sale, and sold goods or services.

350.    The Michigan Consumer Protection Act ("MCPA"), MCL § 445.903 provides that "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful[.]"

351.    For the reasons discussed herein, Defendant violated and continues to violate the MCPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by MCL § 445.903 et seq. Defendant's acts and practices, including its material

Omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

352.    Defendant failed to disclose the material information that the Products contained or risked containing Heavy Metals.

353.    Defendant's Omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained Heavy Metals. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Revord and the Michigan Subclass members suffered damages by purchasing the Products because they would not have purchased such Products had they known the truth, and they received Products that were worthless because they contain or risk containing Heavy Metals.

354.    Defendant's deceptive trade practices caused injury in fact and actual damages to Plaintiff Revord and the Michigan Subclass members in the form of the loss or diminishment of value of the Products Plaintiff Revord and the Michigan Subclass members purchased, which allowed Defendant to profit at the expense of Plaintiff Revord and the Michigan Subclass members. The injuries Plaintiff Revord and the Michigan Subclass members were to legally protected interests. The gravity of the harm of Defendant's actions is significant and there is no corresponding benefit to consumers of such conduct.

355.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Revord's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

356.     Plaintiff Revord and the Michigan Subclass members seek relief for the injuries they have suffered as a result of Defendant's unfair and deceptive acts and practices, as provided by MCL § 445.911 and applicable law.

**COUNT XII**
**Violation Of The Nebraska Consumer Protection Act**
**(Neb. Rev. Stat § 59-1601, 1602, and 1609)**
**(on Behalf of Plaintiff Helmick and the Nebraska Subclass)**

357.     Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

358.     Plaintiff Helmick asserts this claim on behalf of herself and the Nebraska Subclass members that purchased Defendant's Products.

359.     The Nebraska Consumer Protection Act ("NCPA"), Neb. Rev. Stat. § 59-1602, specifically prohibits any "unfair or deceptive acts or practices in the conduct of any trade or commerce."

360.     Defendant has engaged in unlawful, fraudulent, deceptive and unfair business acts and practices in violation of said statute.

361.     Defendant had a duty to disclose and remedy the presence or risk of Heavy Metals in its Products.

362.     Defendant violated the NCPA because it engaged in business acts or practices that are unlawful because it knowingly concealed that its Products contained or risked containing Heavy Metals, and deceived Plaintiff Helmick and the Nebraska Subclass members.

363.     Defendant's Omissions regarding the presence or risk of Heavy Metals in the Products, as set forth in this Complaint, were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

364. Defendant's conduct, as aforesaid, and knowing failure to adequately investigate, disclose, and remedy said conduct, offends established public policy, and the harm caused to consumers greatly outweighs any benefits associated with Defendant's practices. Defendant's conduct has also impaired competition within the Infant Formula industry and has prevented Plaintiff Helmick and Nebraska Subclass members from making fully informed decisions about whether to purchase said Products and/or the price to be paid to purchase them.

365. Plaintiff Helmick and the Nebraska Subclass members have suffered an injury in fact, including the loss of money, as a result of Defendant's unfair, unlawful, and/or deceptive practices.

366. Had Plaintiff Helmick and the Nebraska Subclass members known the truth about the risks and dangers of Defendant's Products, they would not have purchased and/or paid as much for them.

367. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of Nebraska and nationwide.

368. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Helmick's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

369. Plaintiff Helmick requests that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff Helmick and members of the Nebraska Subclass any money Defendant

acquired by its unfair business and competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below, including an award of attorneys' fees.

**COUNT XIII**
**Texas Deceptive Trade Practices and Consumer Protection Act**
**Tex. Bus. & Com. Code §§ 17.41 et seq.**
**(On behalf of Plaintiff Holloway and the Texas Subclass)**

370.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

371.    Plaintiff Holloway brings this claim individually and on behalf of the members of the  Texas Subclass against Defendant for violations of Texas Deceptive Trade Practices and Consumer Protection Act ("TDTPA"), Tex. Bus. & Com. Code §§ 17.41 et seq.

372.    Plaintiff Holloway provided written notice of the specific complaint and damages to Defendant in accordance with Tex. Bus. & Com. Code § 17.05 by letter dated March 11, 2022.

373.    At all material times herein, Defendant engaged in "trade" or "commerce" as defined by the TDTPA.

374.    The TDTPA, Tex. Bus. & Com. Code § 17.46, makes it unlawful to commit "[f]alse, misleading, and deceptive acts or practices in the conduct of any trade or commerce."

375.    For the reasons discussed herein, Defendant violated and continues to violate the TDTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by TDTPA §§ 17.41 et seq. Abbott's acts and practices, including its material Omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

376.    Defendant failed to disclose the material information that its Products contained or risked containing Heavy Metals.

377. Defendant's Omissions were material because they were likely to deceive reasonable consumers to induce them to purchase its Products without being aware that said Products contained or risked containing Heavy Metals. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Holloway and members of the Texas Subclass suffered damages by purchasing the Products because they would not have purchased said Products had they known the truth, and they received Products that were worthless because they contain or risk containing Heavy Metals.

378. Defendant's deceptive trade practices caused injury in fact and actual damages to Plaintiff Holloway and members of the Texas Subclass in the form of the loss or diminishment of value of the Products Plaintiff Holloway and members of the Texas Subclass purchased, which allowed Defendant to profit at the expense of Plaintiff Holloway and members of the Texas Subclass. The injuries to Plaintiff Holloway and members of the Texas Subclass were legally protected interests. The gravity of the harm of Defendant's actions is significant and there is no corresponding benefit to consumers of such conduct.

379. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Doxie's desire to purchase these Products in the future if she can be assured that the Infant Formula is as advertised and does not contain Heavy Metals.

380. Plaintiff Holloway and members of the Texas Subclass seek relief for the injuries they have suffered as a result of Defendant's unfair and deceptive acts and practices, as provided by TDTPA and applicable law.

## COUNT XIV
### Statutory Breach of Implied Warranty
### (Tex. Bus. & Com. Code §2.314)
### (On Behalf of Plaintiff Holloway and the Texas Subclass)

381.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

382.    Plaintiff Holloway brings this cause of action on behalf of herself and the Texas Subclass.

383.    Defendant is and was at all relevant times a "merchant" under Texas Business and Commercial Code §§2.104(1) and 2A.103(a)(20), and a "seller" under §2.103(a)(4).

384.    The Products are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§2.105(a) and 2A.103(a)(8).

385.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which baby food products are used is implied by law, pursuant to Texas Business and Commercial Code §§2.314 and 2A.212.

386.    Defendant impliedly warranted that the Products were of merchantable quality and fit for such use.  This implied warranty included, *inter alia*, a warranty that the Products that were manufactured, supplied, distributed, and/or sold by Defendant were safe for consumption by infants.

387.    Defendant breached the implied warranty of merchantability in that the Products were not in merchantable condition when they were sold to Plaintiff Holloway and the Texas Subclass members because said Products were and are unfit for the ordinary purposes for which such Products are used because they pose a serious safety risk to the babies who consume them.

388.    Defendant has been provided notice of these issues, as alleged herein, by letter sent March 11, 2022.

389.    As a direct and proximate result of breaches of the implied warranty of merchantability, Plaintiff Holloway and the Texas Subclass members have suffered damages.

**COUNT XV**
**Statutory Breach of Express Warranties**
**(Tex. Bus. & Com. Code §2.213)**
**(On Behalf of Plaintiff Holloway and the Texas Subclass)**

390.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

391.    Plaintiff Holloway brings this cause of action on behalf of herself and the Texas Subclass.

392.    Defendant is and was at all relevant times a "merchant" under Texas Business and Commercial Code §§2.104(1) and 2A.1-3A(a)(20), and a "seller" under §2.103(a)(4).

393.    The Products are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§2.105(a) and 2A.103(a)(8).

394.    In connection with the sale of the Products to Plaintiff Holloway and the Texas Subclass, Defendant provided an express warranty.

395.    Defendant breached this warranty by selling Infant Formula that was unsafe for infant consumption.

396.    Defendant has been provided notice of these issues and been given a reasonable opportunity to cure its breaches. by.

397.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff Holloway and the Texas Subclass members have been damaged in an amount to be determined at trial.

## COUNT XVI
### Violation Of The Magnuson-Moss Warranty
### Act, 15 U.S.C. § 2301, *ET. SEQ.* ("MMWA")
### (Asserted on Behalf of all Plaintiffs and Classes)

398.    Each of the preceding paragraphs 1-199 are incorporated by reference as though fully set forth at length herein.

399.    Plaintiffs bring this claim on behalf of themselves and the Classes.

400.    Defendant's Infant Formula is a consumer product as defined in 15 U.S.C. § 2301(1).

401.    Defendant is a supplier and a warrantor as defined in 15 U.S.C. § 2301(4) & (5).

402.    The warranty that effectively came with the Products constitutes a "written warranty" under 15 U.S.C. § 2301(6) (A) and/or (B).

403.    Abbott effectively warranted, expressly and impliedly, that its Products were fit for consumption by babies even though they contained or risked containing undisclosed Heavy Metals.

404.    Plaintiffs and the members of the Classes are "consumers" as defined in 15 U.S.C. § 2301(3). They are consumers because: (a) they are buyers of a consumer product; (b) they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty; and (c) they are entitled to enforce what is effectively a written warranty.

405.    Pursuant to 15 U.S.C. § 2301(e), Plaintiffs and the members of the Classes are entitled to bring this class action and are not required to give Defendant notice and opportunity to cure until such time as the Court determines the representative capacity of the Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

406.    Defendant is liable to Plaintiffs and the members of the Classes pursuant to 15 U.S.C. § 2301(d)(1), because it breached its effective warranty. Specifically, it failed and refused

to honor its own effective warranty by refusing to strip from its Products Heavy Metals and fully and adequately warn consumers, as set forth above.

407.    In connection with its sales of the Products, Defendant gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As part of the implied warranty of merchantability, Defendant warranted that its Infant Formula: (a) was fit for its ordinary purpose as safe for ingestion and consumption by babies; (b) was adequately tested and truthfully packaged; (c) conformed to the promises and affirmations of fact made by Defendant in its packaging, advertising and marketing; (d) was not unsafe or contain poisonous or harmful ingredients for babies to ingest. Defendant is liable to Plaintiffs and the Classes pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability, as set forth above.

408.    Pursuant to 15 U.S.C. § 2310(d) (1), Plaintiffs and the members of the Classes are entitled to recover the damages proximately caused by Defendant's breaches of its effective warranty and the implied warranty of merchantability: direct economic damages at the point of sale in the amount of the difference in value between the value of the Product as warranted (the full purchase price) and the value of the Products as delivered ($0).

409.    In addition, pursuant to 15 U.S.C. § 2310(d) (2), Plaintiffs and the members of the Classes are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expanded) determined by the Court to have been reasonably incurred by Plaintiffs and the members of the Classes in connection with the commencement and prosecution of this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendant as to each and every count, including:

A.      An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendant to bear the costs of class notice;

B.      An order enjoining Defendant from selling the Infant Formula until the Heavy Metals are removed;

C.      An order enjoining Defendant from selling the Infant Formula until the Heavy Metals, or risk of Heavy Metals, are disclosed on the Products' labels, packaging, and advertising;

D.      An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling its existing Infant Formula;

F.      An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

G.      An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of law, plus pre- and post-judgment interest thereon;

H.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

J.      An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

K.  An order requiring Defendant to pay punitive damages on any count so allowable;

L.  An order awarding attorneys' fees and costs to Plaintiffs and the Classes; and

M.  An order providing for all other such equitable relief as may be just and proper.

## **<u>JURY DEMAND</u>**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  March 16, 2022                    By:  /s/ Katrina Carroll

LYNCH CARPENTER LLP
Katrina Carroll
Kyle A. Shamberg
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Phone: (312) 750-1265
Fax: (312) 212-5919
katrina@lcllp.com
kyle@lcllp.com

BARRACK RODOS & BACINE
Stephen R. Basser
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile:  (619) 230-1874
E-mail: sbasser@barrack.com

CALCATERRA POLLACK LLP
Michael Liskow
Janine L. Pollack
1140 Avenue of the Americas, 9th Floor
New York, NY 10036
Telephone: (917) 899-1765
E-mail: mliskow@calcaterrapollack.com
jpollack@calcaterrapollack.com

GEORGE GESTEN MCDONALD, PLLC
Lori G. Feldman
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

GEORGE GESTEN MCDONALD, PLLC
David J. George
Brittany L. Brown
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
E-mail: DGeorge@4-Justice.com
E-service: eService@4-Justice.com

EMERSON FIRM, PLLC
John G. Emerson*
2500 Wilcrest Drive, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Facsimile: (501) 286-4659
E-mail: jemerson@emersonfirm.com